IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

In Re:

Robert A. Sears,

   Debtor.

Case No.  BK 10-40275

In Re:

Koley B. Sears,

   Debtor.

Case No.  BK 10-40277

Chapter 11

## OBJECTION AND RESISTANCE TO MOTION FOR RELIEF FROM AUTOMATIC STAY UNDER 11 U.S.C. §362

Robert A. Sears, Debtor and Debtor in Possession in case No. 40275, ("Robert") and Korley B. Sears, Debtor and Debtor in Possession in case No. 40277, ("Korley") object to the Motion for Relief From Automatic Stay under 11 U.S.C. §362 ("Relief Motion") filed by Rhett R. Sears ("Rhett"), the Rhett R. Sears Revocable Trust ("Rhett Trust"), Ronald H. Sears ("Ronald"), the Ron H. Sears Trust ("Ron Trust"), and Dane R. Sears ("Dane") (collectively "Moving Sears"), admitting, denying, and alleging as follows:

1. Admit the allegations in Paragraphs 1 and 2 of the Relief Motion.

2. Admit the execution and delivery of the promissory notes alleged in Paragraph 3 of the Relief Motion but deny all other allegations in Paragraph 3.

3. Admit the execution and delivery by Robert and Korley of the Pledge and Security Agreement alleged in Paragraph 4 of the Relief Motion; admit the execution and delivery of shares of AFY, Inc. ("AFY") identified by the certificate numbers alleged in subparagraphs a, b, c, and d to Paragraph 4 of the Relief Motion ; admit a copy of the Pledge and Security Agreement is attached to each of the Proof of Claims, but deny all other allegations in Paragraph 4 for lack of sufficient knowledge or information sufficient to form a belief as to the truth of those allegations, lack of time to investigate, or either or both.

4. Admit the allegations in Paragraph 5 of the Relief Motion.

5. Admit the allegations in Paragraph 6 of the Relief Motion that UCC financing statements were filed with the Nebraska Secretary of State; admit that state certificates were delivered to Commercial National Bank; but deny all other allegations in Paragraph 6 of the Relief Motion

for lack of knowledge or information sufficient to form a belief as to the truth of such allegations, or lack of time to investigate, or either or both.

6. Admit the allegations in Paragraph 7 of the Relief Motion that payments were not made in June or July 2009 on any of the Notes described therein; deny all other allegations in Paragraph 7; allege that AFY made all payments that were ever made on such Notes before June or July 2009; deny that either Robert or AFY signed any of such Notes.

7. Deny the allegations in Paragraph 8 of the Relief Motion.

8. Deny the allegations in Paragraph 9 of the Relief Motion; but allege that the schedules speak for themselves.

9. Admit that Paragraph 10 quotes language that is included in the Pledge and Security Agreements, but deny all other allegations in Paragraph 10 of the relief motion.

10. Admit the allegations in Paragraph 11 of the Relief Motion that the Pledge and Security Agreement provides that failure to make payments on the Notes when due is a default but deny all other allegations in Paragraph 11.

3

11. Deny the allegations in Paragraph 12 of the Relief Motion but allege the Pledge and Security Agreement speaks for itself.

12. Deny the allegations in Paragraph 13 of the Relief Motion; and allege that the plain language of the Pledge and Security Agreement is to the contrary.

13. Deny the allegations in Paragraph 14 of the Relief Motion.

14. Allege that the allegations in Paragraph 15 of the Relief Motion are of such a nature that Robert and Korley are not required to admit or deny them; further allege that if required to admit or deny, such allegations are denied.

15. Deny the allegations in Paragraphs 16 and 17 of the Relief Motion.

16. Allege that the allegations in Paragraph 18 of the Relief Motion are of such a nature that Robert and Korley are not required to admit or deny them; further allege that if required to admit or deny, such allegations are denied.

4

A. The cases of Robert and Korley are inseparable and intertwined with the case of AFY, Inc. ("AFY");

B. The Relief Motion should be denied because there is no economic justification for the Relief Motion;

C. The Moving Sears have failed to show and will fail to show cause for relief. The holding of a meeting of stockholder's is not cause;

D. The Moving Sears have failed to show and will fail to show lack of adequate protection for a property interest. They have failed to show any value for the pledged stock they hold.

17. The Moving Sears are not stockholders of AFY. The default in payment by Robert and Korley leaves the ownership of the shares unchanged. For ownership to be changed, the Moving Sears must exercise rights under Article 9 of the U.C.C. and Paragraph 6 of the Pledge and Security Agreement and foreclose on shares.

18. The separation of ownership and the shares of AFY from the power to vote them in the Pledge and Security Agreement does not provide the Moving Sears with the right to vote as owners of its shares. It provides in relevant part that in the event of a default, the Moving Sears as "Secured Parties" may

> "(i) exercise all voting and other rights as a holder of Collateral." (emphasis added)

This language does not give Secured Parties any voting rights unless outside the quoted language a Secured Party has the right to vote. It does not mean that as Secured Parties the Moving Sears have any rights until after a foreclosure sale under the U.C.C. at which the Moving Sears buy the shares. It is provided that the Moving Sears may:

> "(ii) exercise and enforce any and all rights and remedies available on default to a Secured Party under the U.C.C...."

As permitted by Neb. Rev. Stat. § 21-2060 (4) (Cum. Supp 2009), Robert and Korley hereby revoke any and all proxies they have given to any of the Moving Sears.

6

19. Under the By-Laws of AFY:

   A. The annual meetings of the stockholders are to be held on January 2nd each year;

   B. Special meetings of Stockholders may be called by the Board of Directors and by the President and shall be called upon by written requests of <u>stockholders of record</u> holding one fifth or more of outstanding shares of the stock (emphasis added);

   C. The Moving Sears are not stockholders of record; Robert and Korley are the stockholders of record;

   D. Special meetings of stockholders can only be held on at least three but not more than ten days notice;

   E. Only stockholders of record are entitled to vote.

20. Nowhere does the Pledge and Security Agreement give the Moving Sears any irrevocable right to act as stockholders of record, make motions, initiate actions, etc.

21. The rights of the Moving Sears to vote do not include the right to call meetings of stockholders, the right to nominate members of the Board of Directors, or the right to select officers to AFY.

22. Under the Pledge and Security Agreement, Nebraska Law governs and controls the meaning.

23. All of the following are not in the best interest of the estate:

    A) Granting the Moving Sears relief from the automatic stay;

    B) Permitting the Moving Sears to have a meeting of stockholders of AFY

because there will be no return to the Moving Sears as a result of the combination of the low sales prices and Federal and State income and property taxes, and the fact that Sears are equity holders and want distributions of equity ahead of AFY's priority creditors and other unsecured creditors.

8

24. The Relief Motion states in Paragraph 2 that its purpose is to allow the Moving Sears to exercise their voting rights. When deciding whether a meeting of stockholders should be permitted, the Court should deny the request if for clear abuse. Ordinarily the decision should be made after an evidentiary hearing with live witnesses. It was so held in re Johns-Manville Corporation, 801 F2d 60, (2nd Cir. 1986). See also after remand, In re Johns-Manville Corporation et al, 66 BR 517, 518 (Bankr. S.D. NY 1986) ("the Second Circuit reversed and remanded the summary judgment decision directing this court to hold an evidentiary hearing to undertake more elaborate inquiry <u>into clear abuse</u> and <u>irreparable harm</u>."

25. Clear abuse exists when an election of new directors might result in unsatisfactory management, In re Potter, supra:

> "…the bankruptcy court and the district court were justified in denying appellant's petition for a special meeting to elect new directors in view of the finding that such an election <u>might result in unsatisfactory</u>

9

> <u>management</u> and would probably <u>jeopardize both PICO's rehabilitation and the rights of creditors and stockholders</u> sounding the 'death knell' to the debtor as well as to appellant himself" (emphasis added)

593 F2d at 475

26. Rhett has not ever managed the Feed Lot and were he to become the only director and officer, there is substantial risk that the result would be unsatisfactory management.

27. As stated in the above quote from In re Potter, supra, clear abuse also exists if such election would jeopardize AFY's rehabilitation, sounding the death knell to AFY. In the Johns-Manville case, 801 F2d 60 (2d Cir 1986), referred to by the Moving Sears in their papers, it was held that the right of an Equity Committee to call a shareholders meeting:

> "May be impaired only if the Equity Committee is guilty of clear abuse in attempting to call one…the

10

>bankruptcy court found that any shareholder meeting…has the potential to derail the entire Manville reorganization with devastating consequences or at least to delay or halt plan negotiations…"

801 F2d at 64

It was also suggested in a footnote in Johns-Manville that:

>"…if Manville were determined to be insolvent, so that the shareholders lacked equity in the corporation, denial of the right to call a meeting would likely be proper, because the shareholders would no longer be the real parties in interest…"

801 F2d 65, n. 6

For a treatise discussion of the clear abuse rule, see 5 Norton L & Prac. 3d § 96.7.

28. The purpose of the Voting Motion is to undermine and sound the death knell to AFY. Not only does the Voting Motion say so in so many words, but:

A. The Feed Yard and the associated irrigated farm land was purchased by Rolling Stone Land and Cattle owned by Bob Maxwell. After the sale, Maxwell said in the presence of witnesses in substance that "as soon as I turn on the lights to the Feed Yard, I will have made $4 million";

B. There is no legitimate reason for assuming and closing the executory contract with Rolling Stone Land and Cattle for Tract #1 or the executory contracts for Tracts #2-11. The logical inferences for Rhett seeking to do so are either that Rhett has great animosity toward Robert and Korley, and that he is willing to deprive AFY of substantial value or that Rhett has an understanding with Maxwell, the owner of Rolling Stone Land and Cattle, under which Rhett will share in any windfall resulting from any sale of Tract #1 or a combination;

12

C. Tract #1, which is the Feed Yard and over 10 quarters of associated farm ground with manure easements, sold for $6 million. This is $4 million less than $10.3 million (211.55 X 49,000) the value that Farm Credit had appraised the Feed Yard without the farm ground and without the easements as of March 10, 2009;

D. Entirely missing from the Voting Motion and the supporting documents of the Moving Sears is any analysis of whether the executory purchase contracts that Rhett would have the Estate assume are valuable because they provide for sales near the value of the land;

E. The Auction Sale on February 9, 2010 was not adequately advertised; Farm Credit had placed a marketing time on the Feed Yard of 12 to 18 months; the auction was advertised for 6 weeks or less;

F. Also entirely missing from the Voting Motion and the supporting documents of the Moving Sears is any analysis of the income and property tax liabilities for such things as capital gains and accelerated depreciation that will result if the sales are closed. Those income tax liabilities are estimated at over $1 million (with additional tax resulting if the anticipated sale of approximately $1.5 million in equipment is closed). In addition there are property taxes of approximately $194,000 claimed. These liabilities dwarf any liability to the auctioneers;

G. The Ochsner Partnership is available to lease all irrigated farm land of AFY for cash rent of $450,000 if the court permits;

H. In other words, assuming the Executory Contracts resulting from the February 9, 2010 Auction are assumed, it is virtually certain to result in no payment to unsecured creditors because of:

    i. The tax liabilities generated;

14

      ii. And the unreasonably low sales prices at the February 9, 2010 auction;

I. Rhett is hostile and acrimonious toward Robert and Korley and appears to be motivated by a desire to see AFY fail;

J. Rhett has borne a grudge since their father, Redmond Sears had named Robert to manage the Feed Yard instead of Rhett, who is the oldest. Fuel was added when Redmond died and left Redmond's shares to Korley in Trust and left none to others.

29. The Moving Sears are barred from now asserting voting rights in AFY by waiver, laches, estopple, lack of clean hands, and the doctrine that one must do equity to get equity. They delayed an unreasonable time to assert their voting rights after knowing of a default. During the period of delay, Robert and Korley materially changed their position by entering into agreements with secured creditors of AFY, and continuing to work full time in order to liquidate assets in such a way as to maximize the return to both secured and

unsecured creditors of AFY. Korley even mortgaged his house to Farm Credit for millions of dollars.

30. The Moving Sears materially breached their implied obligations to Robert and Korley to perform and enforce their obligations to Robert and Korley in the Pledge and Security Agreement in good faith and with fair dealing. As the result of such material breaches, Robert and Korley are excused and discharged from their obligations under the Pledge and Security Agreements.

31. It is not in the best interest of AFY's estate to assume the Executory Contracts resulting from the February 9, 2010 auction.

32. The February 9, 2010 auction was a failure. The high bids for the eleven tracts, with minor exceptions, were substantially less than the actual value.

33. In particular, the high bid for Tract #1, which consists of AFY's Feed Yard and approximately 1,200 acres of irrigated farm ground, is approximately $4 million below the appraised value.

34. Assumption of the Executory Contract for the eleven tracts as a group, and the executory contract for Tract #1 in particular, would be a violation of the business judgment standard applicable to assumption or rejection of executory contracts requiring good faith reasonable business judgments. Indus. 204 F3d 1276 (9th Cir. 2000). It would also breach the duties of good faith and due care under Nebraska Corporate law. Neb. Rev. Stat. § 21-2099 (Reissue 2007)
`

35. The evidence of Robert and Korley is expected to possibly include affidavits of Robert, Korley, the schedules filed by AFY, and any proof offered by the Moving Sears. The affidavits will identify the Articles of Incorporation and By-Laws for AFY, the values of the 11 Tracts, a statement by Maxwell, and an estimate of tax liability.

17

WHEREFORE, Robert and Korley, Debtors and Debtors in Possession, pray that the Court deny the Motion for Relief From Automatic Stay filed by the Moving Sears and grant Robert and Korley such other relief as is just and equitable.

Dated: April 6, 2010

                    Robert A. Sears,
                    Debtor In Possession

                    and

                    Korley B. Sears,
                    Debtor In Possession

                    */s/ Jerrold L. Strasheim*

By: Jerrold L. Strasheim (#14070)
     3610 Dodge Street, Ste. 212
     Omaha, NE 68131
     (402) 346-9330
     Their attorney

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 6, 2010 the attached Objection and Resistance to Motion for Relief from Automatic Stay was electronically filed with the Clerk of the Bankruptcy Court using the CM/ECF system which sent notification of such filing to all CM/ECF participants.

_____
Jerrold L. Strasheim